JOSE M. FERNANDES & others[1] vs. UNION BOOKBINDING
COMPANY, INC., & others;[2] IONICS, INCORPORATED,
third-party defendant.

Middlesex.   February 3, 1987. — May 14, 1987.

Present: WILKINS, LIACOS, ABRAMS, NOLAN, & LYNCH, JJ.

*Negligence,* Seller of used goods, Comparative, Causing loss of consortium,
Causing loss of parental society. *Uniform Commercial Code,* Warranty.
*Warranty. Sale,* Warranty. *Husband and Wife,* Consortium. *Parent and
Child,* Companionship and society.

At the trial of negligence claims, where there was no evidence to warrant a
finding that a seller in an isolated sale of a used industrial machine with
which the seller had limited experience, knew or should have known of
the machine's dangerous condition, the judge did not err in instructing
the jury, in conformance with Restatement (Second) of Torts § 402
(1965), that the seller could be liable in negligence for only patent, as
opposed to latent, defects. [32-33]

The implied warranties recognized in Uniform Commerical Code, G. L. c. 106,
§ 2-314 and § 2-315, may arise from the sale of used, as well as new,
goods. [33-34]

At the trial of claims resulting from alleged breach of an implied warranty
of fitness for a particular purpose under G. L. c. 106, § 2-315, in the
sale of a used industrial machine, there was ample evidence for a jury
to conclude that the buyer relied on the seller to select a machine suitable
for the buyer's purposes and that the seller knew of the buyer's reliance.
[34-35]

At the trial of claims against the seller of a used industrial machine, no
breach of the implied warranty of fitness for a particular purpose, G. L.
c. 106, § 2-315, was shown, where the plaintiff's injuries in using the
machine were not related to any particular purpose for which his employer
purchased it. [35-36]

Where a product liability claim sounded in negligence and where there was
evidence of the plaintiff's negligence as a contributing cause of his

---

[1] Maria Fernandes, Joseph Fernandes, Grace Fernandes, and Anna Fer-
nandes.

[2] Embossing Machine Service Co., Inc., Embossing Corporation of
America, and Ionics, Incorporated.

injuries it was error for the trial judge not to submit the comparative negligence issue to the jury. [36-37]

At the trial of a claim for breach of the implied warranty of merchantability under Uniform Commerical Code, G. L. c. 106, § 2-314, arising out of the sale of a used industrial machine, there was sufficient evidence to warrant the jury's determination that the proximate cause of the plaintiff's injuries was a design defect and not a failure to maintain the machine in good condition. [37-38]

At a civil trial, the evidence warranted the conclusion that a buyer's inspection did not exclude under G. L. c. 106, § 2-316 (3) (*b*), the implied warranties in the sale of a used industrial machine, where the inspection was not an examination which "ought in the circumstances to have revealed" the defects which allegedly resulted in injury to the operator of the machine. [38]

Because the wife and minor children of an injured party are persons whom the seller of a product might reasonably have expected to be affected if the product caused injury, claims for loss of consortium and loss of parental society may properly be based on a theory of breach of warranty. [39]

CIVIL ACTION commenced in the Superior Court Department on July 2, 1980.

The case was tried before *Joseph S. Mitchell, Jr.,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Lewis C. Eisenberg* for Union Bookbinding Company, Inc.

*Edward J. Krug* for Ionics, Incorporated.

*Leonard Glazer* for the plaintiffs.

*Frederick T. Golder* for Embossing Corporation of America & another.

LYNCH, J. The plaintiff, Jose M. Fernandes, commenced this action to recover for personal injuries which he sustained on June 6, 1980, when a die press he was operating crushed both his hands, necessitating amputation. Maria Fernandes, his wife, claims loss of consortium and his three minor children claim loss of parental society.[3]

---

[3] The claims of Maria Fernandes and her children are hereinafter referred to as the "consortium-society claims," and those plaintiffs are referred to collectively as the "consortium-society plaintiffs."

The plaintiffs collectively brought suit against Union Bookbinding Company, Inc. (Union), the seller of the press to Fernandes's employer, Ionics, Incorporated (Ionics), alleging negligence and breaches of implied warranties of merchantability and fitness for a particular purpose. In addition, the consortium-society plaintiffs amended the complaint to state claims against Ionics based on negligence only. The plaintiffs also brought suit against Embossing Machine Service Co., Inc., and Embossing Corporation of America (Embossing),[4] alleging negligence and breaches of implied warranties of merchantability and fitness for a particular purpose. Embossing was the redesigner and refurbisher of the press which injured Fernandes and was the seller of the press to Union in 1978. The defendants brought various claims against each other for contribution or indemnification.

In December, 1984, the case was tried before a jury. At the close of the evidence, the judge denied Union's motion for a directed verdict on the issue of warranty of fitness for a particular purpose and granted it on the issue of warranty of merchantability. The judge instructed the jury that there could be no recovery for loss of consortium and parental society predicated upon a breach of warranty. The judge also instructed the jury that Union could be found liable for negligence only for patent, but not latent, defects in the press Union sold. The judge denied Ionics's and Embossing's motions for directed verdicts. Additionally, the judge ruled as a matter of law that there was no comparative negligence.

The jury returned a special verdict against Union on Fernandes's claim of breach of warranty and for Union on the negligence claim. Ionics was found liable to the consortium-society plaintiffs for negligence. Embossing was found to have been negligent and in breach of its warranty of merchantability. Judgments on the jury's verdicts were entered.

---

[4] The corporate distinction between Embossing Machine Service Co., Inc., and Embossing Corporation of America, and their individual roles in the facts giving rise to this action, are not germane to the issues raised on appeal. The two corporations are referred to collectively as "Embossing."

Motions by Union, Ionics, and Embossing for judgments notwithstanding the verdict were denied by the judge. Ionics also moved on its cross claims against Union and Embossing. The court denied the motion with respect to Union and allowed the motion with respect to Ionics's cross-claim against Embossing.

All defendants filed timely notices of appeal. The plaintiffs cross appealed from the judge's instructions denying negligence liability for latent design defects, and consortium-society claims in the breach of warranty action. We affirm in part and reverse in part.

We summarize the facts. On the day of the accident, Fernandes was operating a Sheridan 350-ton press, which was used by Ionics to cut out polyethylene components termed "spacer plys" for use in equipment it manufactured to desalinate water. Fernandes had to press two control buttons to activate the movement of a platen which would press up against a stationary platen and cut out a spacer ply. At the end of a single cycle, the press would come to a complete stop with the platens in a full open position. At that point Fernandes would reach in with his hands and pull out the spacer ply. Immediately prior to the accident, the platens had returned to the open position and Fernandes reached in to remove the finished spacer ply. While he was doing so, the press repeated its cycle, and crushed Fernandes's hands between the two platens. Fernandes suffered severe injuries to both hands which resulted in bilateral amputation.

Prior to the purchase of the press Ionics had contracted with Union to produce spacer plys for at least twenty-eight years. Ionics utilized the services of Union as the sole source for cutting the spacer plys and Union cut spacer plys only for Ionics. To meet the demands of Ionics, Union subcontracted work to Embossing. John McNulty, the principal of Embossing, had considerable experience with Sheridan presses and had redesigned the press for Embossing in 1976. However, the press remained at Embossing and was operated on Union's behalf by Embossing.

As the demand for its desalinization equipment increased, Ionics became concerned about being totally dependent on one supplier for spacer plys and decided to acquire an in-house spacer ply cutting capability. As a result, Ionics and Union entered into a written contract to purchase a press for cutting spacers. Union was to determine which press it would supply to Ionics, ultimately recommending the Sheridan press. The contract required that Union "insure that the press is in good working order" and demonstrate satisfactory spacer ply cutting ability. It was Ionics's understanding that the $60,000 purchase price was for "the press, the technology, and the training, and the installation of the Sheridan on our premises."

McNulty installed the press at Ionics and operated it for the Ionics personnel who were present. A Union representative was also present.

Prior to purchasing the press, Ionics sent two employees to look at the press. One employee examined the press to determine whether it was capable of cutting certain types of production pieces. Another Ionics employee saw that the machine was in good working order. Ionics's vice president for operations testified that these employees had only "some" mechanical background and emphasized that he wanted them to go to "view" the press. Ionics also hired a consulting engineer shortly after installation of the press to evaluate its safety.

On the morning of the accident, Bradford H. Schofield, the plaintiffs' expert at trial, was called to Ionics to determine the cause of the accident. Schofield found that the thermal overload switch had been tripped. He determined that this was due to a failure of the air pressure which resulted in the clutch remaining in gear because there was insufficient pressure to push it out of gear. As a result of the failure of the clutch to disengage, the press repeated, thereby causing the accident. He testified that the cause of the accident was the failure of air pressure which resulted in the clutch remaining in gear and that the use of the same energy source (air pressure) both to activate and deactivate the clutch was an unsafe and hazardous design.[5]

---

[5] Schofield performed certain tests at the time of his inspection so as to confirm his findings and conclusions. He established that the "clutch . . .

It was also the opinion of another of the plaintiffs' technical experts, Dr. Igor Paul, that the malfunction and the accident were a direct result of improper, inadequate, and defective design of the press controls, in particular, in failing to provide a "fail-safe" pneumatic control system with a backup clutch disengaging mechanism. Dr. Paul expressed the opinion that the press was "inherently hazardous" although the hazard was hidden. It was also Dr. Paul's opinion that the malfunction and the accident were a direct result of "failing to provide point of operation guarding which would mechanically disconnect and stop the machine, if an operator's hands were in the point of operation before the cycle would complete."

1. *Union's liability in negligence for latent defects.*

The judge instructed the jury that as the seller of used goods in an isolated transaction, Union could only be liable in negligence for patent, as opposed to latent, defects. The plaintiffs contend that Union mischaracterizes its role in the transaction; that Union was "no mere conduit in the channels of trade from manufacturer to ultimate user," and that, as a result, Union's responsibility in selling the press included responsibility for latent defects. We do not view Union's liability as extending to latent defects. There was no error.

As a seller of the press manufactured by another, Union would not be liable in an action for negligence unless it knew or had reason to know of the dangerous condition that caused the accident. Restatement (Second) of Torts § 402 (1965). Without question, Union qualifies as a sophisticated maker of the spacers which it manufactured for Ionics. However, it is equally clear that Union is not a regular seller of presses which would warrant the level of liability which attaches to merchants. There was no evidence to warrant a finding that Union knew or should have known of the dangerous condition of the press. The evidence at trial indicated that over a fifteen to twenty year

worked very well" and "functioned properly" when he put sufficient compressed air into the system. Schofield testified that "there was no galling or scoring on the shaft on which the collar of the clutch rode. There was lubrication on the clutch. It could move very easily"; "[i]t was in very good condition." No parts were broken in the equipment Schofield examined.

period, Union only sold two pieces of used equipment (none of which were die cutting or embossing presses). Union never had possession of the press in question. The Sheridan press was never on Union's premises nor was it operated regularly by any Union employee. The evidence also revealed that repairs to the Sheridan press, as well as Union's two other presses, were performed by Embossing.

The plaintiffs argue that, as a result of Union's experience with presses, including the fact that it knew the Sheridan press it sold to Ionics had fewer safety features than the one it kept for itself, Union had reason to know the press it sold to Ionics was likely to be dangerous unless it had appropriate safety features. We disagree. The Sheridan press had been operated for Union for fourteen months before it was sold to Ionics and there was nothing to indicate to Union the presence of the dangerous condition that caused the accident. Given Union's limited experience, we think the judge's instruction, which conformed with the Restatement (Second) of Torts § 402, was a correct statement of the law.

2. *Breach of warranty for a particular purpose against Union.*

Under G. L. c. 106, § 2-315 (1984 ed.), an implied warranty of fitness for a particular purpose arises when, at the time of the contract, the seller "has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods." The determination whether this warranty arises ordinarily is a question of fact. Comment 1 to § 2-315 of the Uniform Commercial Code, 1 U.L.A. (Master ed. 1984). The jury found that Union was liable to Jose Fernandes for breach of warranty of fitness for a particular purpose.

a. *Used goods.* We note at the outset the question whether G.L. c. 106, § 2-315, applies to used as well as new goods. Although the Uniform Commercial Code itself is silent as to the issue, there is an implicit recognition of the application of implied warranties to the sale of used goods. See, e.g., comment 3 to § 2-314 of the Uniform Commercial Code, 1 U.L.A. (Master ed. 1984) ("A contract for the sale of second-hand goods . . .

involves only such obligation as is appropriate to such goods for that is their contract description. . . . [A nonmerchant's] knowledge of any defects not apparent on inspection would, however, without need for express agreement in keeping with the underlying reason of the present section and the provisions on good faith, impose an obligation that known material but hidden defects be fully disclosed"). See also *International Petroleum Servs., Inc.* v. *S & N Well Serv., Inc.*, 230 Kan. 452, 455-457 (1982); 3 R.A. Anderson, Uniform Commercial Code § 2-314:188 (1983) ("The provisions of the Code relating to warranties applies to all goods, without any distinction as to whether the goods are new or used goods"); Special Project, Article Two Warranties in Commercial Transactions, 64 Cornell L. Rev. 30, 83-85 (1979). In *Ferragamo* v. *Massachusetts Bay Transp. Auth.*, 395 Mass. 581 (1985), we recognized, without discussion, that the sale of used trolley cars was within the implied warranty of merchantability under art. 2 of the UCC. We conclude that the implied warranties recognized in G. L. c. 106, § 2-314 and § 2-315, may arise from the sale of new or used goods.

b. *Reliance*. Under § 2-315, the test for determining the existence of a warranty of fitness for a particular purpose requires proof that (1) the seller had reason to know of the particular purpose for which the buyer requires the goods; (2) the seller had reason to know of the buyer's reliance on the seller's skill or judgment in selecting or furnishing suitable goods; and (3) the buyer's reliance in fact. See 3 J.J. White & R.S. Summers, Uniform Commercial Code 358 (2d ed. 1980). The seller's reason to know and the buyer's actual reliance are often merged into a single "reliance" element, although both are distinct elements to the existence of the warranty. See comment 1 to § 2-315 of the Uniform Commercial Code, 1 U.L.A. (Master ed. 1984); Special Project, 64 Cornell L. Rev. *supra* at 89.

There is ample evidence in the record to support a conclusion that Ionics did in fact rely on Union's judgment to furnish a suitable press to Ionics and that Union knew of Ionics's reliance on its judgment. Union knew that Ionics wanted to be "set up" in the business of making spacers. Union's president testified

that whenever Union was asked to meet with Ionics "the theme was usually the same," namely, that Ionics wanted to get into the business of cutting spacer plys. Union argues that there can be no justifiable reliance on the part of Ionics since Ionics possessed its own skill and judgment in the operation of presses and that Ionics knew Union relied on Embossing for the maintenance and technical expertise on its presses. However, the evidence was that Ionics had no in-house capability for cutting its own spacer plys and that for at least twenty-eight years Union was Ionics's sole source of spacer plys. In addition, Ionics contracted with Union to obtain both the technology and the equipment for cutting spacers. Viewed as a whole, the evidence clearly permits the jury's conclusion that Ionics justifiably relied on Union's judgment to select a suitable press for the production of spacer plys and that Union knew of Ionics's reliance.

c. *Reason to know.* A closer question is raised with respect to the requirement that Union had reason to know of the particular purpose for which Ionics required the goods. The evidence clearly supported a finding that Union knew Ionics purchased the press for the purpose of producing spacer plys. However, Union argues that there was no evidence to demonstrate that the Sheridan press was to be used for a particular purpose and that Ionics intended to use the press for its common ordinary purpose, that of a die press.

Comment 2 to § 2-315, explains that the implied warranty of fitness for a particular purpose "envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question." Comment 2 to § 2-315 of the Uniform Commercial Code, 1 U.L.A. (Master ed. 1984). Under this standard we noted in *Hannon* v. *Original Gunite Aquatech Pools, Inc.,* 385 Mass. 813, 821 (1982), that, where there was no evidence that the buyer was going to use the pool in question for any purpose other than for what a pool is normally used, no particular purpose existed as required for liability under § 2-315. See *Regina Grape Prods. Co.* v. *Supreme Wine Co.,*

357 Mass. 631, 634 (1970). Other jurisdictions have likewise refused to attach liability under § 2-315 in the absence of a known particular purpose. See, e.g., *International Petroleum Servs., Inc.* v. *S & N Well Serv., Inc., supra.* See also 3 J.J. White & R.S. Summers, *supra* at 357 n.122 (criticizing cases applying § 2-315, "where the buyer's 'specific use' coincides with the 'general use' of the goods"); Note, Commercial Law — Implied Warranties Under the Uniform Commercial Code — The Implied Warranty of Fitness for a Particular Purpose, 10 Wake Forest L. Rev. 169 (1974).

We need not decide the close question whether the evidence would warrant a finding of knowledge of use for a particular purpose because we conclude that no breach of this warranty was shown.

The press in question was purchased with the specific understanding that the press demonstrate satisfactory spacer ply cutting ability comparable in quality to cuts received by Ionics from Union. Clearly if the press failed to produce quality spacer plys, Union would not have met the terms of the implied warranty under § 2-315. Here, however, Fernandes's injuries were unrelated to the particular purpose § 2-315 was intended to ensure, the quality of spacer ply. It is true the defect here would fall under the terms of the implied warranty of merchantability. However, § 2-315 is "narrower, more specific, and more precise" than the implied warranty of merchantability. 3 J.J. White & R.S. Summers, Uniform Commercial Code, *supra* at 358. To hold otherwise would be to merge the distinction between the implied warranties of merchantability and fitness for a particular purpose. See generally Covington & Medved, The Implied Warranty of Fitness for a Particular Purpose: Some Persistent Problems, 9 Ga. L. Rev. 149 (1974).

Because the evidence would not support a claim of breach of the implied warranty of fitness for a particular purpose against Union, we need not consider further the claims of Ionics and the consortium-society plaintiffs against Union which are predicated on such a breach.

3. *Claims against Embossing.*

*a. Comparative negligence.* At trial, Fernandes testified that he was unable to grease the press for a period of time before

the accident. Embossing contends that the judge erred in ruling that there was no comparative negligence as a matter of law because there was testimony that the lack of greasing was causally connected to the accident. We agree.

It is clear that the comparative negligence statute, G. L. c. 231, § 85 (1984 ed.), has no application to breach of warranty actions. *Correia* v. *Firestone Tire & Rubber Co.,* 388 Mass. 342, 354-355 (1983). But to the extent that Fernandes's product liability claim sounds in negligence, his own negligence may serve to reduce or defeat that claim under comparative negligence principles applied through G. L. c. 231, § 85. In such case "the question of contributory negligence is rarely to be taken from the jury and decided as a matter of law." *Everett* v. *Bucky Warren, Inc.,* 376 Mass. 280, 289-290 (1978).

The plaintiffs claim that there was not a "scintilla of evidence" that the lack of greasing was causally connected to the accident. However, John McNulty, principal of Embossing and the redesigner of the press, testified that, based on his background, experience, and physical observation of the press after the accident, lack of lubrication over a period of time was the cause of the accident. On this record the question should have been submitted to the jury.

b. *Warranty of merchantability.* Embossing argues that the plaintiffs' implied warranty of merchantability claim under G. L. c. 106, § 2-314, must be rejected because there was no evidence that the press was in the same condition on the date of the injury as it was at the time of the sale. Embossing also seeks to negate its liability under § 2-314 by arguing that the plaintiffs failed to show that the design defect in the pneumatic control system was the proximate cause of Fernandes's injuries. Embossing further contends that Ionics's inspection of the press constituted an exclusion of the warranty under G. L. c. 106, § 2-316 (1984 ed.).

In order to invoke the implied warranty of merchantability under § 2-314, a plaintiff must demonstrate that the damages complained of were proximately caused by a defect or breach which existed at the time of the sale. *Walsh* v. *Atamian Motors, Inc.,* 10 Mass. App. Ct. 828, 829 (1980). See comment 13 to

§ 2-314, of the Uniform Commercial Code, 1 U.L.A. (Master ed. 1984). The jury were instructed that in order to recover damages the plaintiffs must prove that the breach of warranty was the proximate cause of their injuries. The condition of the press at the time of the accident vis-à-vis the time of the sale by Embossing was a factor to be considered by the jury in determining proximate cause. Here the plaintiffs' expert concluded that Fernandes's injuries were caused by design defects and not a failure to maintain the press in good condition.

We further note that Embossing performed the repairs and service to the press following its delivery and installation at Ionics up to the date of the accident. McNulty testified that, upon completion of repairs and servicing, he tested the press and found it, each time, to be in good working order. The judge clearly instructed the jury that Embossing "would only be liable for defective and dangerous conditions which were present at the time they sold the product and parted with possession of it. Unless you find that the condition complained of was in existence at that time, the plaintiff is not entitled to recover from Embossing Corporation of America." Where there was evidence tending to show that the press was defectively designed, although otherwise in good physical condition at the time of the accident, the plaintiffs have satisfied their burden of proof and the verdict will not be disturbed.

Finally, Embossing argues that Ionics's inspection of the press excludes any implied warranties under § 2-316 (3) (b). We disagree. At trial, the jury focused their attention on the issue by specifically requesting further instruction from the judge on the "consequences of a buyer's examination or failure to examine goods." In response, the judge read § 2-316 (3) (b) to the jury and, pursuant to the jury's request, gave them a photocopy of the text of that section. Under that section examination prior to sale excludes implied warranties only in regard to defects which such an examination ought to have revealed. We think the evidence warrants the jury's verdict which implicitly recognized that Ionics's examination was not one which "ought in the circumstances to have revealed" the defects in the press under § 2-316 (3) (b).

c. *Consortium and society claims.* The consortium-society plaintiffs argue that recovery for consortium or society claims should be recognized in an action for breach of the implied warranty of merchantability, as in negligence actions. We agree. As we stated in *Wolfe* v. *Ford Motor Co.,* 386 Mass. 95, 100 (1982), "we find no magic in the label 'warranty' but rather we look to the substantive quality of the claims against [the defendant] and find them to be essentially tort claims." Although *Wolfe* dealt with the issue of contribution under G. L. c. 231B, the rationale is equally applicable to consortium and society claims. See *Henningsen* v. *Bloomfield Motors, Inc.,* 32 N.J. 358, 414 (1960) (noting tort origins of warranty); W. Prosser & W. Keeton, Torts § 97 (5th ed. 1984).

Under § 2-318, the spouse and minor children of an injured person are persons whom the seller might reasonably have expected to be affected by a product if such product caused injury to their spouse and parent. As a result, we conclude that the loss of consortium and society claims asserted by those plaintiffs may be based upon a breach of implied warranty action and that the judge's instruction to the contrary was error.

Accordingly, we affirm the judgment for Union on the negligence claims but reverse the judgment against Union on breach of warranty. We vacate the judgment against Embossing on the negligence claims and affirm the judgment against Embossing based upon breach of warranty of merchantability. Therefore, the jury verdict for plaintiff Jose Fernandes against Embossing for breach of the implied warranty of merchantability is to stand, and the verdict for Jose Fernandes against Embossing for negligence is set aside. The jury verdict for Jose Fernandes against Union is set aside. The jury verdict for the consortium and society plaintiffs against Embossing for negligence is set aside. Judgment is entered for the consortium and society plaintiffs on their breach of warranty claim against Embossing. We do not examine the correctness of the judgments against Ionics based on negligence since they are not before us.

*So ordered.*