Murtagh, Thomas R., J.
The undisputed facts and the contested facts stated favorably to the defendant are as follows.
1. American International Chemical, Inc. (“AIC”) provided Bismuth Subsalicylate USP (“BSS”) to ANIP Acquisitions Company (“ANIP”), which in turn used the BSS as the active ingredient in the manufacture of generic versions of Pepto-Bismol.
2. Prior to purchasing any quantity of an active ingredient such as BSS from a particular supplier/manufacturer, ANIP first tests and validates the material in order to credential the source.
3. ANIP performed this validation and testing process on the BSS manufactured by Omicron Quimica, S.A. (“Omicron”), which is distributed in the United States by AIC. ANIP’s validation process involves multiple steps and took as long as ninety (90) days. AIC sent a specification sheet to ANIP and the business relationship commenced in either 2002 or 2003.
4. In October 2006 and January 2007, AIC provided BSS to ANIP pursuant to ANIP purchases orders 70776 and 71632.
5. Among the BSS that AIC sold and shipped to ANIP pursuant to those purchase orders were AIC Lot Numbers 62440023 (“Lot 23”) and 62440040 (“Lot 40”) (the “First BSS Shipment”).
6. ANIP received Lots 23 and 40 on or about October 3, 2006 and January 17, 2007, respectively.
*189 7. ANIP’s cost of Lot 23 was $9,675 and for Lot 40 was $11,250, for a combined cost of $20,925.
8. From AIC Lot 23, ANIP created finished product batches Y167-Y173.
9. From AIC Lot 40, ANIP created finished product batches Y222-Y224 and X038.
10. According to expressed terms, ANIP P.O.s 70776 and 71632 required that AIC provide Bismuth Subsalicylate USP (manufactured by Omicron), and that each lot of material include a certificate of analysis (“COA”). ANIP’s purchase orders also requested product from one manufacturer’s lot and that the product have a shelf life of no more than (2) years.
11. AIC understood that ANIP most likely intended to use the BSS which it purchased for use in a liquid product thus requiring the BSS to remain in suspension. At the commencement of their relationship AIC provided initial samples of BSS to ANIP, which samples were tested and approved by ANIP. Veegum and other agents are added to the liquid with the intention of keeping the BSS particles in suspension.
12. At that time (and presently), the United States Pharacopeia (the “USP”) standard body specifications contained no particle size specification for BSS.
13. Indeed, ANIP conducted tests on the First BSS Shipment to ensure that the BSS met the USP specifications.
14. ANIP did not test for particle size prior to releasing the material into production, either in October 2006 or January 2007.
15. The COAs that AIC provided with the First BSS Shipment did not warrant a specific particle size. Rather, the COAs provide the manufacturer’s test results for USP specifications, as well as other information concerning the manufacture of the BSS (including but not limited to the manufacturer’s name, Omicron Química, S.A., and the date of manufacture). They do not certify or even reference a particle size.
16. AIC’s own product listing by which it offers BSS for sale does not contain, reference or warrant a certain particle size. It mirrors the USP requirements, the same product specification requirement pursuant to which ANIP ordered the First BSS Shipment (and all of its BSS shipments).
17. On or about October 30, 2006, after using ninety-five percent (95%) of the 450 kilograms of BSS in Lot 23, ANIP performed a sieve analysis which involved passing a thirty-eight (38) gram sample of the unused raw BSS through a 40-mesh screen. After doing so, ANIP determined that 6.1% of the material did not pass through the screen and was therefore prevented from being filled into the bottle.
18. On or about January 30, 2007, after using sixty-seven percent (67%) of the 500 kilograms of BSS in Lot 40, ANIP passed fifty (50) grams of the BSS through a 40-mesh screen and concluded that 4.2% of the BSS was prevented from being filled into the bottle.
19. Ultimately, ANIP discarded its finished product batches Y168-Y171 and Y173 from AIC Lot 23, and all finished product batches from AIC Lot 40 for low assay strength. Because of the too large particle size which did not stay in suspension, the levels of active ingredient fell below specification in the finalized bottled product.
20. ANIP did not immediately reject the First BSS Shipment, but instead, after testing it for conformity with its required specifications, passed the material into production.
21. Between April 25, 2007 and July 5, 2007, AIC provided an additional $103,275 worth of BSS to ANIP pursuant to invoices numbers 217325, 218424 and 219155 (the “Second BSS Shipment”).
22. Of that amount, ANIP paid $16,931, leaving a balance of $86,344.
23. The balance of $86,344 represented the value that ANIP assigned to its rejected finished product batches due to the allegedly non-conforming particle sizes in the First BSS Shipment.
24. ANIP used that material from the Second BSS Shipment to create a viable end product that it was able to sell.
DISCUSSION
AIC seeks to recover the full unpaid balance of $86,344 for the Second BSS Shipment. ANIP maintains it owes nothing more to AIC because it is entitled to offset its claim against AIC resulting from its alleged need to reject finished product batches of its product because of too large particle sizes in AIC’s First BSS Shipment to ANIP. ANIP claims offsetting damages against AIC in an amount which exceeds the amount owed to AIC with respect to the Second BSS Shipment.
ANIP argues that genuine issues of material fact exist with respect to its counterclaim for breach of contract, breach of the implied covenant of good-faith and breach of warranty of fitness for a particular purpose.
The transactions at issue between AIC and ANIP involve the sale of goods and are governed, therefore, by Article 2 of the Uniform Commercial Code.
I. ANIP’s Counterclaims A. Breach of Contract
Defendant’s counterclaim for breach of contract appears to be based upon an allegation that AIC promised to deliver BSS with a particle size limit. *190 There is nothing in the purchase order confirmation documents which reference a particle size. The COA also made no mention of a particle size. In other words, no relevant document specifies the requirement of a particular particle size for product to be furnished to ANIP. As evidence of a particle size limit, ANIP points to a 1997 AIC product specification sheet that contains amaximum mean particle size designation of 3.4 microns. However, in addition to there being no evidence that ANIP knew about or relied upon this specification sheet, the specification sheet concerns a different Bismuth product which carried a different product code (BISSPH) than that applied to the product sold to ANIP (BISSUP). It appears unchallenged that BISSPH was a specifically ordered product for a specific customer who imposed additional requirements for AIC’s BSS product.
ANIP contends that AIC did not deliver a product consistent with not only samples but also with prior product shipments. The Court has found no evidence on the record of a particle size for product previously delivered or for samples. Without such evidence, a claim of inconsistency cannot be established.
ANIP ordered BSS conforming with USP standards. ANIP was aware that the USP specification for BSS contained no particle size specification. ANIP received product from AIC in compliance with UPS specifications. ANIP did not impose its own particle size requirements on the product it ordered. When product was delivered, ANIP tested the product for compliance with USP specifications and did not test for particle size. After the sieve tests which demonstrated that the sieve prevented BSS from passing into the bottle, ANIP only then decided it was important to determine a particle size specification with AIC, to have the particle size specification and result appear on the manufacturer’s Certificate of Analysis and to perform a sieve analysis to determine product retained on a 40-mesh screen until the particle size specification was established.
AIC is entitled to Summary Judgment on ANIP’s breach of contract claim.
B. Warranty of Fitness for a Particular Purpose
In order to establish a claim for breach of an implied warranty of fitness for a particular purpose, ANIP must demonstrate the following three elements.
First, the seller must have reason to know of the particular purpose for which the buyer requires the goods; second, the seller must have reason to know that the buyer is relying on the seller’s skill or judgment in selecting or furnishing suitable goods; and third, the buyer in fact must rely upon the seller’s skill or judgment.
Glyptal, Inc. v. Engelhard Corporation, 801 F.Sup. 887, 897-98 (D.Mass 1992) (granting summary judgment against claimant-buyer of chemical product where buyer tested samples to ensure product met its requirements before purchasing) (emphasis added), citing Fernandes v. Union Bookbinding Co., 400 Mass. 27, 34 (1987). As a matter of law, ANIP cannot establish the second and third elements and its claim must fail.
Based upon the validation testing performed by ANIP and the beginning of the arrangement with AIC/OMICRON and the testing performed by ANIP on each lot it received from AIC for compliance with USP specifications, there is no reason to believe that ANIP was relying on AIC’s skill or judgment in selecting AIC’s BSS product. Given ANIP’s testing it is quite clear that ANIP did not rely on AIC’s skill or judgment but rather its own analysis and conclusions. See Glyptal at 898.
C. Implied Covenant of Good Faith and Fair Dealing
The implied covenant of good faith and fair dealing “does not create rights and duties not otherwise provided for with the existing contractual relationships.” North American Expositions Company Limited Particularly v. Corcoran, 458 Mass. 852, 869 (2009). The Court has already concluded that there was no requirement in any contrast between AIC and ANIP that AIC produce for ANIP a BSS product with a particular particle size. Thus, for this and other reasons, this claim fails.
II. AIC’s Claims for Breach of Contract, Breach of Implied Covenant of Good Faith and Fair Dealing and Quantum Meruit
It is undisputed that ANIP accepted the Second BSS Shipment from AIC and incorporated AIC’s BSS in products which ANIP then sold. Thus, under its purchase order contract with AIC, ANIP owes AIC the sum of $86,344 representing the amount remaining unpaid for the Second BSS Shipment. AIC is entitled to Summary Judgment concerning its Breach of Contract Claim (Count I). ANIP’s claims for Breach of Implied Covenant and Good Faith and Fair Dealing (Count II) duplicates its contract claim and adds nothing. This Count should be dismissed. Likewise, the Quantum Meruit Claim (Count III) should be dismissed. A Quantum Meruit claim might be an appropriate remedy where no contract is established. Here, liability of AIC exists under a contract theory.
ORDER
Judgment is to enter for Plaintiff AIC on Count I in the amount of $86,344. Counts II and III of the Complaint are dismissed. Judgment enters for Plaintiff AIC on all of defendant ANIP’s Counterclaims.