# United States Court of Appeals
## For the First Circuit

No. 24-1966

CHRISTOPHER ALICEA, as Personal Representative
of the Estate of Luis M. Prieto,

Plaintiff, Appellant,

v.

CINCINNATI INCORPORATED,

Defendant, Appellee,

NEW AUTOMATION CORPORATION, d/b/a PythonX, d/b/a Burlington
Automation, d/b/a The Lincoln Electric Company, d/b/a Lincoln
Electric Holdings, Inc.,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Aframe, Lipez, and Howard,
Circuit Judges.

Robert F. Foster, with whom Peter J. Ainsworth and Meehan,
Boyle, Black & Bogdanow, P.C. were on brief, for appellant.
Christopher A. Duggan, with whom Andrew D. Black and Smith,
Duggan, Cornell & Gollub, LLP were on brief, for appellee.

February 6, 2026

**AFRAME**, <u>Circuit Judge</u>. Luis Prieto, a laser-cutting system operator, died when a descending steel beam trapped him between two components of a laser-cutting system. After his death, Prieto's estate sued Cincinnati Incorporated, which designed, sold, installed, and maintained the system.[1] The estate brought essentially three claims against Cincinnati. First, it claimed that Cincinnati negligently designed the system and breached its warranty of merchantability on design defect grounds. Second, it argued that Cincinnati negligently installed the system and breached its warranty of merchantability on manufacturing defect grounds. Third, the estate alleged that Cincinnati negligently failed to maintain the system's safety and warn of its dangerous condition. Following discovery, the district court granted Cincinnati's motion for summary judgment on all claims. The estate now appeals. We vacate the district court's order on the design-related claims because there is a material factual dispute on whether there was a reasonable alternative design that could have mitigated the system's dangers. We otherwise affirm.

---

[1]   The case was originally filed in state court and was removed to federal court on diversity grounds. The estate also brought claims against a separate entity, New Automation Corporation, that had manufactured and helped install a component of the system. Prior to Cincinnati's motion for summary judgment, the parties stipulated to New Automation Corporation's dismissal from the action.

## I.

## A.

In October 2017, Industrial Metal Products Company ("InMetal"), a metal fabricator located in Sharon, Massachusetts, hired Prieto to operate the laser-cutting system that it had purchased from Cincinnati in late 2000 or early 2001. The system has three components: (1) a material handler, or "loader," that has two parts -- a storage rack and an elevator, (2) a load frame, and (3) a main frame.[2] The system works as follows. Metal sheets of various types and sizes are stored on the material handler's storage rack waiting to be cut. When a metal sheet is requested, the handler elevator moves the selected sheet from the storage rack down to the load frame. The metal sheet then moves from the load frame to the main frame, where it is cut by a laser.

As is relevant here, there is a narrow gap between the material handler, where metal sheets are stored, and the load frame, where metal sheets are placed in advance of cutting. The gap is no more than twelve inches wide. When the material handler's elevator descends to transfer a metal sheet to the load

---

[2] InMetal added the material handler to the system after the installation of the laser cutter. The material handler was designed and manufactured by New Automation Corporation per an agreement with Cincinnati. For the purpose of these proceedings, there is no dispute that Cincinnati was responsible for the design, installation, and maintenance of the system.

frame, a steel support beam that rests under the elevator slides into this gap, creating a pinch point.

On July 12, 2018, Prieto was operating the system with a coworker. When his coworker activated the system, he did not see that Prieto had entered the gap. As the elevator dropped, the steel support beam resting under the elevator descended into the gap, pinning Prieto to the load frame. The steel beam crushed Prieto's mid-section. Emergency responders extricated Prieto after about ninety minutes, but he died shortly thereafter. Below is a diagram of the system, including a demarcation for where Prieto stood when the accident occurred.



As the diagram shows, Prieto was caught a few feet from the laser operator control station. No one saw how Prieto reached the pinch point on the day of the accident. There were at least three routes by which Prieto could have entered the gap. First,

he could have used a small stepladder kept at the laser operator control station to maneuver around a barrier fence and then over the load frame, sliding into the gap.  Second, he could have proceeded to the front of the load frame and then scrambled over it, again sliding into the gap.  Or third, he could have walked around the system to the wall-side entryway, which, on the day of the accident was not guarded by a barrier.  He could have then shuffled sideways, with his feet facing the load frame, eight feet down the narrow gap to the pinch point.

On at least one occasion prior to the incident, Prieto was reprimanded for entering the gap.  InMetal's owner, Craig Perry, testified that Prieto had no work-related reason for ever entering the gap.  Conversely, Prieto's predecessor at InMetal, Daniel Pond, testified that operating the laser cutter did require periodic entry into the gap to remove metal scraps that would fall to the floor or get caught between the machines.  Pond also testified that, during his InMetal employment, he entered the gap through the wall-side entrance because he thought it was the easiest approach.  Pond never met or communicated with Prieto.

The estate produced an expert witness to opine on the system's design.  The expert included the following opinions in his report:  (1) there was no safety barrier on the system's wall-side entrance when Prieto's accident occurred; (2) there should have been an "E-stop" mechanism accessible from the pinch

- 6 -

point to halt the machine; (3) there should have been a safety mat -- a pressure-sensitive device that would stop the machine when pressed -- on the floor under the pinch point; (4) Cincinnati was negligent in not providing a wall-side barrier and other safety measures, i.e., the E-stop and a safety mat; (5) a wall-side barrier and additional safety measures were feasible and would have impaired neither the usefulness nor the operation of the system; and (6) Prieto would not have died had Cincinnati provided a wall-side barrier and these additional safety measures.

During the expert's deposition, the expert amended his report based on information gleaned over the course of the accident investigation and litigation. Whereas his report stated that "there was never a confirmation" that the wall-side barrier had been installed, during his deposition, the expert clarified that Cincinnati had initially installed a safety barrier along the wall-side entryway, and that the barrier later had been removed. When asked whether the barrier constituted a "reasonable way of guarding that area" and whether "[t]he system with that guard in place [was] reasonably designed," the expert answered affirmatively. He also maintained that "there should have been a safety mat in between the edge of the loader and the load bed" and that "an E-stop should have been accessible from the area where Mr. Prieto was crushed."

Finally, the record demonstrates that Cincinnati continued to maintain the system after its installation at InMetal. Following the system's installation, a Cincinnati employee, Jose Nunez, visited InMetal periodically and completed maintenance reports. During these visits, Nunez did not notice that the wall-side entry was unguarded and neither took steps to install a barrier nor report its absence to InMetal employees.

**B.**

Following discovery, Cincinnati moved for summary judgment on all claims. Over the estate's opposition, the district court granted the motion in a short rescript.

The district court appears to have addressed first the design and installation claims together, which it labeled "the breach of warranty [of merchantability] claim." The court found that "Cincinnati's product, as designed and installed, included a barrier fence protecting the gap between the laser and machine handler on the wall-side of the machine." The court held that "with the barrier fence installed, and the gap between the laser and machine handler thus adequately protected . . . there was no breach of warranty at the time the machinery was delivered to and installed at the InMetal facility." To support its conclusion that the barrier had at some point been installed, the court relied on record evidence including "marks of wear and tear" where the

- 8 -

missing wall-side barrier would have been fastened. The court also cited the estate's expert's deposition testimony that (1) the system came installed with a barrier to guard the wall-side entry to the pinch point and (2) the barrier was a reasonable way of guarding the area.

The district court next addressed "the negligence and related claims." We understand the court's reference to "negligence and related claims" to pertain to Cincinnati's alleged failure to maintain and warn of the missing wall-side barrier in the years following the system's assembly.[3] The court concluded that as for these issues, the estate had failed to create a triable question on causation, a necessary element for a negligence claim. The court observed that the undisputed evidence established at least three means by which Prieto could have reached the pinch

---

[3]    Our understanding is informed by the fact that under Massachusetts law, if there were no breach of the warranty of merchantability then there would be no basis for finding a triable issue on negligent design or manufacturing. See Haglund v. Philip Morris, Inc., 847 N.E.2d 315, 322 n.9 (Mass. 2006) ("A defendant cannot be found to have been negligent without having breached the warranty of merchantability." (quoting Colter v. Barber-Greene Co., 525 N.E.2d 1305, 1313 (Mass. 1988))); see also Cipollone v. Yale Indus. Prods., Inc., 202 F.3d 376, 379 n.3 (1st Cir. 2000) (finding pursuant to Massachusetts law that its "conclusion that there is no breach of warranty of merchantability justifie[d] summary judgment on [the plaintiff's] negligence claims"). We apply Massachusetts law because our jurisdiction is premised on diversity and the parties reasonably agree that Massachusetts law governs this dispute. See, e.g., Shay v. Walters, 702 F.3d 76, 80 (1st Cir. 2012).

point, and the estate had failed to identify evidence from which a factfinder could conclude that Prieto was more likely to have entered through the exposed wall-side opening than through an alternative path. Absent such evidence, the court held that Cincinnati's alleged negligent maintenance and failure to warn claims could not be considered a proximate cause of Prieto's injuries.

Finally, the district court addressed "[t]wo other minor points." First, it offered a second reason for rejecting the negligent maintenance claim. It concluded that Cincinnati's service employee Jose Nunez's "responsibility did not include assessing the safety of the material handling system," and thus "[t]he obligation to assure the safety of the machinery rested with InMetal and its employees," not Cincinnati. Second, it held that the testimony from Prieto's predecessor, Daniel Pond -- that "he, like Prieto, also entered the hazardous area between the laser and material handler" and that his "safety concerns were expressed to InMetal employees, not Cincinnati employees" -- was "not germane to the question of Cincinnati's responsibility for Prieto's death."

The estate timely appealed.

## II.

### A.

We review de novo the district court's grant of summary judgment and may affirm on any ground supported by the record. See Collazo v. Nicholson, 535 F.3d 41, 44 (1st Cir. 2008). In conducting our review, we construe the facts and all reasonable inferences from those facts in favor of the non-movant -- here, the estate. See Pleasantdale Condos. LLC v. Wakefield, 37 F.4th 728, 733 (1st Cir. 2022).

A district court may grant summary judgment on a claim or part of a claim if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence would enable a reasonable factfinder to decide the issue in favor of either party." Irobe v. U.S. Dep't of Agric., 890 F.3d 371, 377 (1st Cir. 2018). "A fact is 'material' if it 'has the capacity to change the outcome of the [factfinder's] determination.'" Id. (alteration in original) (quoting Perez v. Lorraine Enters., Inc., 769 F.3d 23, 29 (1st Cir. 2014)).

Where a movant asserts that there is an absence of evidence to support claims on which the non-movant bears the burden of proof, the non-movant "may defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trial worthy issue persists." Calvi v. Knox County, 470 F.3d 422,

426 (1st Cir. 2006); see also Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991). Fulfilling this obligation requires the estate to do more than the "frenzied brandishing of a cardboard sword." Calvi, 470 F.3d at 426. Rather, to reach trial, the estate must identify evidence that is "significantly probative" on the disputed issue. Irobe, 890 F.3d at 377 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). "[A] conglomeration of 'conclusory allegations, improbable inferences, and unsupported speculation'" will not suffice. Calvi, 470 F.3d at 426 (quoting DePoutot v. Raffaelly, 424 F.3d 112, 117 (1st Cir. 2005)).

**B.**

The estate challenges the district court's rejection of its claims that Cincinnati (1) negligently designed the system and breached its warranty of merchantability on design defect grounds, (2) negligently installed the system's wall-side barrier and breached its warranty of merchantability on manufacturing defect grounds, and (3) negligently failed to maintain the system's wall-side barrier and warn of its dangerous condition following the installation.

As for the negligent design and corresponding warranty claims, the estate argues that the court wrongly concluded that the system was appropriately designed as a matter of law on the ground that the wall-side barrier, by itself, was a "reasonable"

- 12 -

way of guarding the gap.  The estate contends that it introduced sufficient evidence to raise a triable issue on whether the system's risks could have been reduced or eliminated by the adoption of one or more reasonable alternatives, such as introducing an E-stop and a safety mat.

The remaining claims -- the negligent installation claim and related breach of warranty claim as well as the negligent maintenance and failure to warn claims -- all involve the system's wall-side barrier.  As is relevant here, the estate contends that the court wrongly concluded that there was no evidence that Prieto entered the gap from the wall-side entrance.  To the contrary, the estate argues there is sufficient evidence of Prieto's wall-side entry, and such evidence creates a trial-worthy issue on whether Cincinnati's negligence in installing and maintaining the missing wall-side barrier caused Prieto's injury.  We address these arguments, starting with the design-related claims.

**1.**

The estate challenges the district court's rejection of the negligent design claim and related breach of the warranty of merchantability claim, arguing that a factfinder could conclude that the system's design was defective.  The design, the estate posits, failed to include additional safety mechanisms, specifically an E-stop and a safety mat, that would have halted the system or made it inoperable when someone stood in the gap.

- 13 -

When evaluating claims of negligent design, the factfinder considers "whether the product [has been] designed with reasonable care to eliminate avoidable dangers." Cigna Ins. Co. v. Oy Saunatec, Ltd., 241 F.3d 1, 15 (1st Cir. 2001) (quoting Uloth v. City Tank Corp., 384 N.E.2d 1188, 1191 (Mass. 1978)). Liability is "imposed where the defendant 'has failed to use reasonable care to eliminate foreseeable dangers which subject a user to an unreasonable risk of injury.'" Haglund, 847 N.E.2d at 322 n.9 (quoting Colter, 525 N.E.2d at 1313).

Likewise, for warranty of merchantability claims, the factfinder considers whether a product, at the point of sale or distribution, is fit for its ordinary purpose -- that is, its intended and foreseeable use. See Evans v. Lorillard Tobacco Co., 990 N.E.2d 997, 1010 (Mass. 2013); Haglund, 847 N.E.2d at 322. Liability attaches where "a product that is 'defective and unreasonably dangerous' . . . for the '[o]rdinary purposes' for which it is 'fit[,]' causes injury." Evans, 990 N.E.2d at 1010 (first alteration in original) (quoting Haglund, 847 N.E.2d at 322).[4]

---

[4]     A breach of the warranty of merchantability can arise "because of a manufacturing defect, a design defect, or a warning defect." Evans, 990 N.E.2d at 1010 (citing Restatement (Third) of Torts: Products Liability § 2 (Am. Law Inst. 1998)).

Under Massachusetts law, "actions for negligence and for breach of warranty impose distinct duties and standards of care." Haglund, 847 N.E.2d at 322 n.9 (quoting Colter, 525 N.E.2d at 1313). While a breach of warranty claim focuses on "product characteristics," a negligence action centers "on the defendant's conduct." Cigna, 241 F.3d at 15 (quoting Back v. Wickes Corp., 378 N.E.2d 964, 970 (Mass. 1978)). Moreover, the causes of action differ regarding the defenses available to a defendant.[5] That said, "'the nature of the decision [in both actions] is essentially the same.' . . . [A] finding that a defendant has negligently designed a product is tantamount to a finding that the product is unfit for ordinary use." Cigna, 241 F.3d at 15-16 (first alteration in original) (quoting Back, 378 N.E.2d at 970). Thus, "[i]n most substantive respects . . . the negligence and warranty inquiries are congruent." Gillespie v. Sears, Roebuck & Co., 386 F.3d 21, 26 (1st Cir. 2004).

As is relevant here, under either a theory of negligent design or a theory of breach of warranty arising from a design

_____

[5] For a negligence claim, a defendant may establish comparative negligence to limit or prevent damages based on any foreseeable misuse of a product by the plaintiff -- whether the defect is known or not; by contrast, for a breach of warranty claim, a plaintiff's foreseeable misuse of a product in the face of a known defect can serve as an affirmative defense to preclude liability. See Cigna, 241 F.3d at 16-17 (applying Massachusetts law).

- 15 -

defect, a "plaintiff must show 'an available design modification [that] would reduce the risk without undue cost or interference with the performance of the [product],' and the jury must consider whether a safer alternative design was available in deciding whether the defendant was negligent for failing to adopt that design." Evans, 990 N.E.2d at 1024 (second alteration in original) (quoting Colter, 525 N.E.2d at 1310-11).

Here, the estate alleged that the system design was inadequate because of its failure to have an E-stop device and a safety mat in the area where Prieto was injured. In support of this contention, the estate relied on its expert's opinion, which Massachusetts courts have routinely found necessary in design defect cases. See Enrich v. Windmere Corp., 616 N.E.2d 1081, 1084 (Mass. 1993) ("The presence of such a defect cannot be inferred in the absence of expert testimony."). The expert's report concluded that "Cincinnati was negligent in failing to provide adequate guarding and safety measures as discussed herein," which the expert had identified as an E-stop and a safety mat. It added that the adoption of such "measures [was] feasible and would not have impaired the utility or usefulness of the machines." The report also stated that the absence of these safety measures caused Prieto's death.

During his deposition, the expert responded affirmatively when asked if (1) "there should have been a safety

mat in between the edge of the loader and the load bed" and (2) "an E-stop should have been accessible from the area where Mr. Prieto was crushed." The expert further testified that if Cincinnati "had a safety mat there, [Prieto would] be alive now." Where a "plaintiff can show an available design modification which would reduce the risk without undue cost or interference with the performance of the machine," a jury question exists. Uloth, 384 N.E.2d at 1193; see also Evans, 990 N.E.2d at 1014. Here, the estate has made such a showing, thereby establishing a triable issue on the adequacy of the system design.

As we note above, the district court rejected the estate's design claim on the ground that the estate's expert had testified that the system with a wall-side barrier installed would be reasonably safe without additional safety mechanisms. The district court cited an exchange during the expert's deposition where the expert acknowledged that a wall-side barrier was initially installed and later removed from the system. The expert testified as follows:

> Q: Okay.· There's no doubt that this barrier had been there, right?
>
> A: There's no doubt.
>
> . . .
>
> Q: And would you agree with me then . . . that would be a reasonable way of guarding that space?

- 17 -

. . .

A: That would be reasonable.

. . .

Q: So we're in agreement that when the loader
   was installed, that fence -- barrier fence
   guard was in place at some point?
. . .

A: Yes.

Q: And we are in agreement that that's a
   reasonable way of guarding that area,
   correct?

A: It's reasonable.

Q: The system with that guard in place is
   reasonably designed, true?

. . .

A: On its face reasonable.

The district court (and Cincinnati on appeal) construed the last answer as an admission by the expert that because the wall-side entry was guarded by a barrier at some point, the overall system was safely designed. We disagree with the court's interpretation of the testimony. The court's interpretation divorces the final exchange from what came before. A factfinder reasonably could interpret from the context that the expert's "[o]n its face reasonable" response meant that while the expert believed that the barrier was a reasonable way to prevent access to the gap from the wall-side entryway, he was not opining that the entire system was safely designed because of the wall-side barrier.

In arguing for an affirmance of summary judgment on the design claims, Cincinnati offers several alternative arguments. None are persuasive.

First, Cincinnati contends that the expert's opinion that the system required additional safety mechanisms presumed that the system had been designed without a wall-side barrier. Not so. The expert's report explained that his "first thought" was that an additional safety mat or mats were necessary because the wall-side entry was unguarded. However, he ultimately concluded that even assuming the wall-side entry was guarded, the fact that there remained multiple, unguarded ways to reach the pinch point meant that, "safety mats [were] still necessary, especially since there [were] work-related reasons for operators to enter this dangerous area."

Cincinnati next asserts that the expert's opinion that additional safety mechanisms would have prevented Prieto's injuries was conclusory. But there is no dispute that Prieto died from injuries sustained while he was in the gap and the expert opined that a properly functioning safety mat or an E-stop would have prevented the system from operating while Prieto stood in the gap. What follows then is not a conclusory assertion but rather a reasoned, commonsense inference that Prieto's injuries could have been mitigated or prevented if these additional safety mechanisms were in place. See Hayes v. Douglas Dynamics, Inc., 8

F.3d 88, 92 (1st Cir. 1993) (noting that an expert affidavit "must at least include the factual basis and the process of reasoning which makes the conclusion viable").

Cincinnati similarly contends that the expert's opinion is speculative because it does not address "the fact that Prieto intentionally put himself in this very dangerous space and made no evident effort to get out." Cincinnati asserts that to the extent Prieto was "playing games," additional safety mechanisms would have been of little assistance. However, Prieto's reasons for being in the pinch point, and specifically whether Prieto was "playing games," is in dispute. On the one hand, Craig Perry, InMetal's owner, testified that there was no work-related reason for a laser operator to enter the gap. Furthermore, the record indicates that on at least one other occasion prior to the incident, Prieto was reprimanded for entering the pinch point. On the other hand, there is evidence that there were work-related reasons to be in that location. In particular, Prieto's predecessor, Daniel Pond, testified that metal scraps would periodically fall into the gap and would need to be cleared by the

operator.[6]  The conflicting evidence creates a factual dispute on why Prieto was in the pinch point on the day of the accident.[7]

Finally, Cincinnati contends that introducing the E-stop and a safety mat would in fact make the system more dangerous.  It argues that such mechanisms would encourage operators to enter the gap based on the false assumption that it would now be safe to do so.  This contention, however, goes to what constitutes a reasonable system design and thus is a question for the jury.  See Osorio v. One World Techs. Inc., 659 F.3d 81, 84–85 (1st Cir. 2011) ("It is the province of the jury to determine whether the relevant factors, properly balanced, suggest that a product's [proposed alternative] design is unreasonable." (citing Back, 378 N.E.2d at 970)); see also Laramie v. Philip Morris USA Inc., 173 N.E.3d 731,

---

[6]  Cincinnati separately argues that Pond's testimony is irrelevant to the case.  We disagree.  While not all of Pond's testimony is relevant, see infra at 26-27, we find that his testimony regarding how the laser-cutting system operated and the steps required by the operator of the system to keep the system functioning are factual observations that establish the scope of foreseeable uses of the system.  Such testimony has "significant[] probative" value.  Irobe, 890 F.3d at 377 (quoting Anderson, 477 U.S. at 249).

[7]  In a footnote, Cincinnati makes a brief and undeveloped reference to Prieto's conduct as an unforeseeable "intentional and dangerous misuse" of the system for which Cincinnati cannot be liable.  To the extent Cincinnati asserts this contention as an independent basis to affirm, the argument is undeveloped and thus waived.  See Tax-Free Fixed Income Fund for P.R. Residents, Inc. v. Ocean Capital LLC, 137 F.4th 6, 24 (1st Cir. 2025) ("[A]rguments raised only in a footnote or in a perfunctory manner are waived." (quoting P.R. Tel. Co., Inc. v. San Juan Cable LLC, 874 F.3d 767, 770 (1st Cir. 2017))).

747 n.12 (Mass. 2021) (explaining that a jury may contemplate a broad range of factors "[i]n determining 'whether an alternative design is reasonable and whether its omission renders a product not reasonably safe'" (quoting Restatement (Third) of Torts: Products Liability § 2 (Am. Law Inst. 1998))).

In sum, the estate has established a triable issue on whether there was a reasonable alternative design that could have prevented or mitigated Prieto's injuries.  The district court therefore incorrectly granted summary judgment on the design claims.

2.

We turn next to the two remaining claims, each of which relates to the absence of a barrier on the wall-side entry.  The estate first contends that there is evidence that Cincinnati never installed the wall-side barrier, which, it contends, constitutes negligence and a breach of the warranty of merchantability.  See Restatement (Third) of Torts: Products Liability § 2 cmt. c (Am. Law Inst. 1998) (explaining that "[c]ommon examples of manufacturing defects" include "products that are . . . incorrectly assembled").  The estate separately argues that regardless of whether Cincinnati installed the wall-side barrier, the fact that there was no barrier in place on the day of the accident demonstrates that Cincinnati had been "negligent in failing to fulfill its obligation to service, inspect, [and]

maintain the [system]" and in failing to warn InMetal that the wall-side entrance was unguarded.[8]

These claims share a common feature in that they all require the estate to establish causation; specifically, that the absence of the wall-side barrier caused Prieto's injury because Prieto likely arrived at the pinch point from the wall-side entrance. See Fernandes v. Union Bookbinding Co., Inc., 507 N.E.2d 728, 734 (Mass. 1987) ("In order to invoke the implied warranty of merchantability . . ., a plaintiff must demonstrate that the damages complained of were proximately caused by a defect or breach which existed at the time of the sale."); Corsetti v. Stone Co., 483 N.E.2d 793, 805 (Mass. 1985) ("In an action based on negligence, the plaintiffs '[have] the burden of proving that a defect attributable to the manufacturer's negligence caused the injury.'" (alteration in original) (quoting Carney v. Bereault, 204 N.E.2d 448, 451 (Mass. 1965)); Reckis v. Johnson & Johnson, 28

_____

[8] We do not understand the estate to have premised its negligent maintenance claim on the absence of additional safety mechanisms apart from the wall-side barrier. While the estate does note that Cincinnati's service worker, Jose Nunez, "never reported the lack of guarding or any other safety mechanisms to anybody at InMetal," the estate specifically identified the "[i]nadequate [g]uarding" as the basis of its maintenance claim. To the extent the estate sought to claim that Cincinnati negligently failed to report "any other safety mechanisms" to InMetal, the claim is undeveloped and thus waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

- 23 -

N.E.3d 445, 464 (Mass. 2015) (explaining that "[t]o prevail on their claim of failure to warn, the plaintiffs had to establish that the lack of this warning caused" the harm (citing Laaperi v. Sears, Roebuck & Co., 787 F.2d 726, 729 (1st Cir. 1986))).

Establishing causation does not require the estate to "point out the exact way [the] accident happen[ed]." Solimene v. B. Grauel & Co., K.G., 507 N.E.2d 662, 667 (Mass. 1987) (quoting McLaughlin v. Bernstein, 249 N.E.2d 17, 22 (Mass. 1969)). It does, however, require the estate to identify "evidence from which reasonable [people] may conclude that it is more probable" than not that the missing wall-side barrier caused Prieto's injury. Mullins v. Pine Manor Coll., 449 N.E.2d 331, 339 (Mass. 1983). Here, we agree with the district court that there is no evidence from which a reasonable factfinder could conclude that it was more likely than not that Prieto reached the pinch point from the wall-side entry than from an alternative entry point. It is undisputed that there were at least two other ways by which Prieto could have reached the pinch point location: (1) he could have relied on the stepladder that was located next to the laser operator control station or (2) he could have scrambled over the load frame. The record is otherwise devoid of evidence showing how Prieto reached the location on the day of the accident or at any previous time.

- 24 -

The estate attempts to fill this evidentiary gap by relying on the testimony of Daniel Pond, Prieto's predecessor at InMetal. Pond testified that he would periodically access the gap through the wall-side entry because the other entry options were "more of a pain." The estate argues that like Pond, Prieto "most likely would [also] have entered through the unguarded, wall-side gap."

Such evidence does not "elevate . . . surmise from the realm of the possible to the realm of the probable," Tobin v. Fed. Express Corp., 775 F.3d 448, 452 (1st Cir. 2014), especially where the record otherwise contains no evidence indicating how Prieto may have accessed the gap. That Pond preferred a particular entry point does not mean that Prieto shared that preference. Pond never met Prieto, nor is there evidence that they ever communicated on any topic. Moreover, Pond's preferred approach was not necessarily the obvious one; as Pond testified, it required "shimmying," i.e., side-stepping with his back against the handler and feet facing the load frame, eight feet down a channel that was less than a foot wide. Assigning Pond's preference to Prieto would amount to speculation and conjecture. And "[s]peculation about mere possibilities, without more, is not enough to stave off summary judgment." Id. Accordingly, the district court properly granted Cincinnati summary judgment on the claims related to the absence of the wall-side barrier.

- 25 -

## III.

For the reasons discussed, we **affirm** the award of summary judgment on the installation, maintenance, and failure to warn claims; **vacate** summary judgment on the design claims; and **remand** for further proceedings consistent with this opinion.  Each party shall bear its own costs.

**So ordered**.